**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

APR 29 2026 1:33 P

U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF OHIO-COLUMBUS

---

ERIC F. FREED, D.C.,
*Plaintiff,*

v.

CITY OF BELPRE, OHIO;
PATROLMAN G.W. SMITH (Badge No. 918), individually and in his official capacity;
SGT. J.R. FIELDS (Badge No. 692), individually and in his official capacity;

*Defendants.*

---

Case No.: 2:26 CV 0520 Judge: JUDGE MARBLEY
Magistrate Judge Shimeall

**COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS**
**42 U.S.C. § 1983**
**AND PENDANT STATE LAW CLAIMS**

**JURY TRIAL DEMANDED**

---

## I. JURISDICTION AND VENUE

1. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this action arises under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. Supplemental jurisdiction over state law claims exists under 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because all events giving rise to these claims occurred in the City of Belpre, Washington County, Ohio, within the Eastern Division of this District.

## II. PARTIES

3. Plaintiff Eric F. Freed, D.C., is an adult resident of Ohio and a licensed Doctor of Chiropractic. At all times relevant to this action, Dr. Freed was the lawful owner of real property located at 739 Campbell Drive, Belpre, Ohio 45714 ("the Property"). He owned and resided at the Property as his primary residence from October 23, 2002, as reflected in Washington County Auditor records (Parcel No. 080026976000, Owner: FREED ERIC, classified owner-occupied). He continuously resided there for more than twenty-three years and never surrendered possession prior to or during the events described herein. Dr. Freed operates a chiropractic practice and is a commercial real property owner and landlord with active commercial tenants and business relationships.

4. Defendant City of Belpre, Ohio is a municipal corporation and political subdivision of the State of Ohio located at 715 Park Drive, Belpre, Ohio 45714. It is subject to suit under Ohio Revised Code Chapter 2744 and 42 U.S.C. § 1983, and is responsible for the policies, customs, practices, training, and supervision of the Belpre Police Department and its officers.

5. Defendant Patrolman G.W. Smith (Badge No. 918) is a police officer employed by the City of Belpre. He is sued individually and in his official capacity. At all relevant times he acted under color of state law.

6. Defendant Sergeant J.R. Fields (Badge No. 692) was, at all relevant times, a supervising police officer employed by the City of Belpre. He is sued individually and in his official capacity. At all relevant times he acted under color of state law.

## III. STATEMENT OF FACTS

### A. Plaintiff's Ownership, Residency, and Background

7. Dr. Freed owned the Property and continuously exercised possessory rights over it, including maintaining personal belongings there, accessing the home regularly, and retaining unrestricted control over entry. His Ohio Driver's License lists 739 Campbell Drive as his address. Officers saw, noted, and retained it at the time of arrest.

8. At all times relevant to this action, Dr. Freed paid all utilities at 739 Campbell Drive in his own name, including water service billed by the City of Belpre, electric service through AEP, and gas service through Enbridge. The City of Belpre was simultaneously billing Dr. Freed as the utility account holder at 739 Campbell Drive while its Police Department prosecuted him for criminal trespass at that same address.

9. At all times relevant to this action, Dr. Freed held a LibertyGuard Deluxe Homeowner's Insurance Policy through Liberty Mutual on 739 Campbell Drive — a homeowner's policy requiring active owner occupancy, not a rental or investment property policy.

10. Dr. Freed is an experienced commercial property owner and landlord. No written lease existed, no rent was paid, and the occupants did not have exclusive possession of the Property. The issuance of a notice to vacate was a routine exercise of a property owner's civil rights under Ohio law.

## B. The Guest Arrangement

11. Dr. Freed owned the Property and continuously exercised possessory rights over it, including maintaining personal belongings, accessing the home regularly, and retaining unrestricted control over entry. He was in the process of remodeling the property and simultaneously working on a separate property at 513 Blennerhassett Avenue, Belpre. Dr. Freed permitted a guest and the guest's brother to stay at 739 Campbell Drive on a revocable, informal basis during the remodel. The express terms of the arrangement were that it was not a rental, that 739 Campbell Drive remained Dr. Freed's home, and that he would come and go freely throughout the remodel as he continued work on the property. No lease or rental agreement existed with either occupant. No landlord-tenant relationship existed under Ohio law. Neither paid rent, signed any agreement, or made any financial contribution to the property. Dr. Freed retained full possessory rights at all times, never surrendered possession, and never moved out. His mail continued to be delivered to 739 Campbell Drive, the bulk of his personal belongings remained there, and he accessed the property multiple times daily in the course of the ongoing remodel. The guests were accommodated during an active owner-occupied remodel — not given possession of a vacant or abandoned home. The Washington County Sheriff's Office call report documents Monika's address of record as 350 S. Harper St., Nelsonville, Ohio. The Belpre Police Department dispatch call record from June 7, 2025 documents Pawel's address of record as 1/2 Loren Ave., Athens, Ohio. Neither guest's legal address of record was 739 Campbell Drive. Dr. Freed's legal address of record was 739 Campbell Drive, as documented on his Ohio driver's license. At no time did either individual have exclusive possession of the property or the authority to exclude Dr. Freed from it.

12. The guest's brother repeatedly violated the conditions of his stay by smoking marijuana inside the home despite being told on multiple occasions not to do so. The smoke was so pervasive that family members present at the property complained about an unfamiliar odor inside the home. When Dr. Freed confronted the guest about this violation and directed him to leave, the guest responded by asserting that he and Monika lived there and that Dr. Freed did not. Monika and Pawel placed 911 calls on multiple occasions when Dr. Freed appeared at his own property. Dr. Freed was unaware of any of these calls except the June 8 call in which he simultaneously called dispatch to report marijuana use — and was told the matter was civil. He consistently and repeatedly asserted throughout all proceedings that he was not the landlord but the homeowner and resident of the Property.

13. Dr. Freed's personal belongings were located at 739 Campbell Drive at all relevant times, including a safe containing legally owned firearms, money, and business documents, along with his business records and mail. His privilege to be present derived from his fee simple ownership and continuous possession. No court order, no eviction judgment, and no restraining order had altered Dr. Freed's possessory rights at 739 Campbell Drive.

14. The officers' own signed reports confirm Dr. Freed's continuous possession and the nature of the arrangement. Patrolman Smith's report records Monika's statement that Dr. Freed would "stop by 3-4 times per day." Sergeant Fields' report records Monika's statement that Dr. Freed had told her he would be stopping by to retrieve

items. Fields' report also records Monika's statement that Dr. Freed would bring groceries and food to the home and drop them off without her asking for any of it. Dr. Freed told both officers directly that the arrangement was not a rental, that 739 Campbell Drive was his home, and that he would come and go as he pleased — and that he had never moved out and had never given up possession. These statements are all recorded in the officers' own signed reports.

**C. Prior Police Contact — June 7, 2025**

15. On June 7, 2025 — two days before Dr. Freed's arrest — there were two separate calls to Belpre Police Department regarding 739 Campbell Drive. The first (CFS ID No. 25-002944, 10:25 a.m.) was a walk-in complaint with no identified caller, describing the matter as "17 on station in ref to landlord showing up at the residence unannounced." The call was resolved as completed. The second call (CFS ID No. 25-002952, 6:44 p.m.) was a 911 call by Pawel, the guest's brother, who reported that the "landlord" had entered the residence without notice. Both calls falsely characterized Dr. Freed as "the landlord." No landlord-tenant relationship ever existed. In response to the second call, Belpre Police dispatch documented at 6:55 p.m.: "915 advised caller this is a civil matter and how to obtain a protection order." The dispatch record also noted "Freed gone upon officer arrival." Within 48 hours prior to the arrest, both Belpre Police and the Washington County Sheriff's Office had classified the dispute as civil and not criminal.

16. Dr. Freed had no knowledge of the June 7 calls at the time they were made. No officer contacted Dr. Freed in connection with any of the June 7 calls to advise him of the dispute or warn him against returning to his own property.

**D. June 8, 2025 — Sheriff's Response**

17. On June 8, 2025, Dr. Freed was present at 739 Campbell Drive. A call was made to Belpre Police (CFS ID No. 25-002961, 9:12 a.m.) describing an "unwanted subj landlord inside the res telling renter to leave throwing." The dispatch record listed Eric Freed as the "suspect" and disposed the call as "completed, advised, turned over to other agency. The WCSO call report documents that Monika was not present at 739 Campbell Drive on June 8 — she was house sitting in Athens County and her return time was unknown. Pawel was present at the property. Dr. Freed also contacted Belpre Police dispatch on June 8 to report that an occupant was smoking marijuana inside his home.

18. The Washington County Sheriff's Office was dispatched to 739 Campbell Drive under WCSO Case No. 25-007686, classified as an "Assist Agency" matter — not a criminal investigation. Washington County Sheriff's Lt. Hornbeck and D/S J.B. Welch (Unit 2210) responded. Belpre Police Sergeant Nichols also responded to the property. Deputy Welch was wearing body camera, recording the response. Upon arrival, Dr. Freed advised Welch that he owned the residence, that his driver's license listed 739 Campbell Drive as his address, and that he disagreed with Pawel being added to the household. Dr. Freed asserted his ownership and his right to be present. Welch's narrative further documents that Pawel stated Dr. Freed enters the home whenever he wants. Welch informed Dr. Freed of the proper eviction procedure and advised that the situation was civil in nature and that the required first step was a

three-day notice to vacate. Sgt. Nichols was present throughout and himself advised Dr. Freed that the three-day notice was the required first step. During this exchange, Dr. Freed told the officers that the arrangement was not a rental, that 739 Campbell Drive was his home, and that the agreement was that he would come and go as he pleased — the same account he gave to Smith and Fields the following day. Welch reviewed evidence the occupants claimed supported their position and found it "did not have any information about a crime." No criminal investigation was opened and no referral was made. Dr. Freed did not learn of the specifics of Welch's review and rejection of the occupants' claimed evidence until months after the arrest, through public records requests made following dismissal of the criminal case.

19. Following the WCSO response, Belpre PD placed a follow-up call to the Washington County Sheriff's Office. The WCSO call report for Case No. 25-007686 documents what Belpre PD communicated in that follow-up call: that Dr. Freed owned the property, that there was no lease, and that Dr. Freed was claiming residency at both of his properties. This communication was made the day before the arrest and is documented in Belpre PD's own records. At every stage prior to the arrest, law enforcement classified the matter as civil and not criminal.

**E. June 9, 2025 — Notice to Vacate and First Police Response**

20. Following the June 8th response, Dr. Freed did precisely what both D/S Welch and Sgt. Nichols had advised on camera: he retained an attorney who prepared a formal three-day Notice to Vacate the Premises (Document No. 4924-5018-5548, v.1). The notice identified Dr. Freed as the property owner and stated that the occupants were "occupying without color of title."

21. Dr. Freed's attorney had confirmed to him that he had every legal right to be present at 739 Campbell Drive.

22. On June 9, 2025, Dr. Freed went to his home at 739 Campbell Drive to check the basement and sump pump due to water issues at the property. He posted the attorney-prepared notice to vacate on his front door and on the kitchen counter, and then left. Monika called 911 at approximately 1:51 p.m. (CFS ID No. 25-002976). Monika did not report a crime or an emergency. She stated she needed to speak to Belpre Police because an officer had told her to call whenever Dr. Freed came to the property. She stated the officer had supposedly told Dr. Freed he had to give 24-hour notice before coming — a conversation Dr. Freed denies occurred and which is not documented in any police record produced. Her complaint on the first call was precisely: "he's not supposed to be here without a 24 hour notice." Monika apologized repeatedly throughout the call, including stating "I'm sorry to be doing this." At no point during the call did Monika refer to 739 Campbell Drive as "my house" — she referred to it only as "the house" or "the residence." When dispatch asked where Dr. Freed was, Monika stated he was in the house. When asked whether Dr. Freed knew she was in the house, she responded "yeah, yes of course — I was sitting outside." She described the sequence as: she was sitting outside when Dr. Freed arrived, went upstairs, and then called 911. From her position upstairs, she could not observe what Dr. Freed was doing in the interior downstairs of the home. Dispatch responded "let me get an officer over that way for you" and ended the call.

23. Sergeant Fields (Unit 692) and Patrolman Smith (Unit 918) both responded to the first call. Dr. Freed was not present when they arrived. The dispatch record notes: "918 adv male was gone on officers arrival, had left a 'leave the premises' letter on the front door." The dispatch transmission to responding officers had stated: "Campbell, receive a 911 call from a female subject — did not understand her name. She's advising Dr. Freed showed up. He is currently in the house. She advised he has been trespassed from there but he showed up anyway." The recorded 911 call documents that Monika did not state Dr. Freed had been trespassed — she stated she had been told to call when he showed up and that they could possibly charge trespassing. While Dr. Freed was not present, Sergeant Fields ran the plates of a vehicle parked in the driveway. The plates came back registered to Dr. Freed. Officers personally observed the attorney-prepared notice to vacate posted on the front door. The notice stated the occupants were "occupying without color of title." The incident report documents that officers retained the notice as evidence. From the scene of the first call, Sergeant Fields called the Washington County Sheriff's Office and left a voicemail for Deputy Welch asking whether BPD should handle the case or have it added to Welch's existing matter. Fields' own narrative supplement documents that Monika told him during this call that she was going to put a chain guard on the door so Dr. Freed could not just walk in anytime he wished. Fields documented this statement and took no action.

**F. June 9, 2025 — The Arrest**

24. At approximately 4:00 p.m., Dr. Freed returned to his home at 739 Campbell Drive to check the sump pump and mow the lawn. While inside, Dr. Freed discovered a chain lock that had been installed on his front door without his knowledge or permission. Dr. Freed removed the chain lock from his own front door.

25. Monika placed a second 911 call (CFS ID No. 25-002980) at approximately 4:07 p.m. She called 911 and asked to be transferred to Belpre Police Department. She did not report a crime or an emergency. Her reason for calling was stated simply: "Dr. Freed is back in the house." She again stated she was calling only because an officer had told her to call whenever Dr. Freed came. On two separate occasions during the call she stated she did not know if an officer needed to come and that she was only calling because she had been told to. She stated: "I don't know if an officer needs to come — I know he'll leave or something — they told me to keep calling when he does show up because it's now considered trespassing and we're trying to build a case against him." She further stated: "I'm just doing what I was told by the officer." She described her brother having installed a deadbolt so Dr. Freed could not enter if she locked it from the inside, but stated she had not locked it. She stated Dr. Freed had left a note on the door but that he was not allowed to do that without 24-hour notice. She stated she was upstairs in the bathroom and stated "I'm watching him and he's still here." From an upstairs position in this home, the interior downstairs is not visible — observation from upstairs is only possible through a window to the outside. Dispatch instructed her: "I want you to stay on the phone with me until the officers get there — that way if he leaves you let me know." Dispatch then instructed her to stay upstairs while officers handled the situation. Neither call described a crime, an emergency, a threat, or any conduct by Dr. Freed beyond his presence in his own

home.

26. Sergeant Fields and Patrolman Smith both responded to the second call. Smith arrived first. Fields arrived approximately two minutes after Smith. Fields carried documented firsthand knowledge from the first call that: (1) Dr. Freed had not been present at the property when officers first arrived yet a vehicle registered to Dr. Freed was parked in the driveway; (2) Dr. Freed had left a formal attorney-prepared notice to vacate identifying him as the owner; (3) Belpre PD dispatch had previously classified the underlying dispute as civil on June 7, 2025; (4) the Washington County Sheriff's Office, and Belpre police Sergeant Nichols, had previously classified the underlying dispute as civil; and (5) the occupants had announced their intention to install a chain lock to exclude the titled owner.

27. Without a warrant, without Dr. Freed's consent, and without any exigent circumstances, Defendant Smith forced entry into 739 Campbell Drive. Prior to entry, Smith could not see into the home and had no visual basis for believing any emergency existed inside. Prior to entry, no sounds of disturbance, altercation, or distress were audible on the 911 call, and no information relayed to officers indicated an emergency or threat requiring immediate entry. Dr. Freed had been present at the property before the call was made. During the approximately four minutes of the recorded 911 call before Smith arrived, no dogs barked, no altercation occurred, and no disturbance of any kind is audible on the recording. Smith's arrival at approximately 16:11 is audible on both the recorded 911 call — as "the truck is here" — and on the dispatch audio of Smith's arrival. Within approximately 20 seconds of his arrival the dogs inside began barking loudly. No knock or doorbell is audible on the 911 call before the dogs began barking. Smith could not have seen Dr. Freed removing the chain lock before forcing entry — he only encountered that scene after crossing the threshold. Monika had stated she had not locked the deadbolt. Upon forcing entry, Smith stated "you're not supposed to be here." Approximately 8 seconds after entry, following indistinct chatter, Dr. Freed is audible on the 911 call stating "it's my house." Smith instructed Dr. Freed to put down his tools and made physical contact with Dr. Freed's arm. Smith then stated "step outside, let's talk." Dr. Freed complied. Upon Dr. Freed stepping outside, Smith immediately handcuffed him behind his back with no questions asked. Smith's own narrative report states he arrived and found Dr. Freed "ripping down a lock Ms. Parkinson had put up inside the door" — identifying the lock as Monika's before he had spoken to her. The recorded second call establishes that Monika was upstairs in the bathroom at the time and her post-arrest statement characterizing the lock removal was not based on personal observation. Upon entry, Dr. Freed informed Smith that whoever had installed the lock had no right to put it there to lock him out of his own home. This statement was made before the arrest decision was finalized, was not investigated, and does not appear in any official police report. Fields arrived approximately two minutes after Smith and documented that he found Smith with Dr. Freed outside the home, and that Smith had stated he detained Dr. Freed upon Dr. Freed exiting the home. Officer Smith had forced entry without knocking or announcing his presence, directed Dr. Freed outside, and placed him in handcuffs — without asking Dr. Freed a single question, before conducting any investigation, before interviewing any witness, and before any charge had been determined. At the time of entry and arrest,

Defendants knew or had available to them: (a) Dr. Freed was the titled owner; (b) no lease existed; (c) the dispute had been classified as civil the prior day; and (d) Dr. Freed asserted his right to be present. Despite this, Defendants conducted no investigation to resolve these known facts before arresting him.

28. Smith's own narrative supplement records that Dr. Freed told Smith he was not the landlord of the home because he lived there and that he had 24/7 access to the house because he lived there and it was his house. That assertion — recorded in Smith's own report — was made before any charge was determined and was disregarded without investigation. Smith stated "you don't live here." Smith also stated "you served a notice to vacate today."

29. Smith's sworn Affidavit of Facts in Support of Probable Cause cited as its basis that Dr. Freed had failed to give 24-hour notice before entering the property. The affidavit also characterized the 911 call as the caller stating that Dr. Freed had walked into her house — a characterization contradicted by the recorded 911 call. No charge had been determined and no witness had been formally interviewed at the time of the physical arrest. No officer identified any statute, court order, or legal authority requiring Dr. Freed to provide notice before entering his own property.

30. Following the arrest, Defendant Smith executed and filed a criminal complaint charging Dr. Freed with criminal trespass under O.R.C. 2911.21(A)(1), alleging that Dr. Freed knowingly entered or remained "on the land or premises of Monika Parkinson" without privilege. A true and correct copy of the criminal complaint is attached as Exhibit A. The complaint did not identify any basis for concluding that Dr. Freed lacked privilege to enter property he owned and continuously possessed.

31. Dr. Freed told Smith that 739 Campbell Drive was his home, offered to show his driver's license listing that address, and explicitly stated that he was not the landlord — he was the homeowner and resident. Dr. Freed was immediately handcuffed before he could produce the license. Officers subsequently took possession of the license at some point during the encounter. Dr. Freed stated his attorney had confirmed his right to be there, offered to have Smith call his attorney to verify this, and informed Smith that his personal belongings were inside the home, including a safe containing business documents, money, and legally owned firearms. Smith refused to verify Dr. Freed's ownership and refused to call his attorney.

32. Defendant Fields arrived while Dr. Freed was already handcuffed. Fields' own signed police report identifies Dr. Freed as the homeowner upon his arrival. Fields' own narrative supplement further documents that the prior day's response had been treated as a civil matter: "Sgt Nichols/Belpre PD had informed her on yesterdays date the process for a CPO or TPO and how to apply for one as well as Deputies from Washington County S.O. had relayed the same information." No prior trespass order or trespass warning against Dr. Freed was ever issued. The June 9 first-call dispatch entry characterized Dr. Freed as having been trespassed. Dr. Freed was unaware of this characterization or that officers had responded to the first call before his return to the property. The recorded 911 call documents that Monika did not state Dr. Freed had been trespassed, and Fields' own signed narrative documents only that officers had directed the guests to pursue civil remedies.

33. Dr. Freed again asserted his ownership, explicitly stated that he was not the landlord but the homeowner and resident of 739 Campbell Drive, stated his attorney had confirmed his rights, and asked Fields to call his attorney. Fields refused. Fields documented his refusal in his own signed police report: "Mr. Freed asked me to call his Atty to verify he was allowed to come to the residence and I advised him I was not going to call his Atty."

34. No police report documents any inquiry by Smith or Fields into the terms of the arrangement under which the occupants were staying at 739 Campbell Drive. The absence of any lease was documented in the Belpre PD call records available to both officers. Dr. Freed told both officers directly that there was no lease, that the occupants were guests, that the arrangement was not a rental, that 739 Campbell Drive was his home, and that he had the right to come and go freely. Monika's post-arrest written statement to Fields states: "Doc Freed came to the house without a 24hr notice. Let himself in without being asked." Defendants made no effort to verify readily available information confirming Plaintiff's ownership and lawful presence — including his driver's license, the notice to vacate in their possession, and his offer to have officers contact his attorney — before handcuffing him and placing him in a patrol vehicle. Defendants disregarded readily available exculpatory information and failed to take minimal steps to verify ownership and lawful presence before making the arrest

35. While Dr. Freed was handcuffed in a locked patrol vehicle — in custody and before Miranda warnings were given — Fields told Dr. Freed that officers were "looking into" what charge to bring, including a possible burglary charge. Dr. Freed responded: "For what? Stealing my own stuff?" Fields replied that burglary is "unlawful entry combined with committing another crime." This exchange does not appear in any official police report.

36. Dr. Freed was arrested without any charge having been determined at the time of the physical arrest. Smith's own narrative supplement confirms the sequence: Dr. Freed was detained and placed in a patrol vehicle before any charging decision was made, before any witness was interviewed, and before any contact with the prosecutor had occurred. The Belpre PD dispatch record documents that while Dr. Freed was already detained, Smith was "speaking with Sheriffs Office ref the matter to see if he was told not to come back or not" — confirming that Smith was in active communication with WCSO during Dr. Freed's detention, before the charge was formally filed. Additionally, Fields had called WCSO earlier that afternoon and left a voicemail for Deputy Welch. According to Smith's narrative supplement, only after Dr. Freed was already in custody did Smith contact an Assistant Washington County Prosecutor, who according to that narrative directed Smith to charge Dr. Freed with criminal trespass "for now" while additional felony allegations were evaluated. What Smith told the prosecutor and what the prosecutor actually said in response is not known to Dr. Freed and is a matter for discovery. Those felony allegations were never sustained. No felony charges were ever filed.

37. The articulated basis for the arrest and prosecution changed across multiple official documents. At the scene, Smith stated "you served a notice to vacate today." While Dr. Freed was handcuffed in the patrol vehicle, Fields discussed a possible burglary

charge. Smith's sworn probable cause affidavit cited the 24-hour notice theory. The City Prosecutor's office later confirmed in writing that the probable cause determination had been made by an Assistant County Prosecutor based on "additional allegations of possible felony offenses made on the same date." The City Law Director's December 30, 2025 ratification letter characterized the basis as Monika claiming to be a tenant and the notice to vacate being a landlord remedy. Each document reflects a different articulation of the basis for the arrest and prosecution.

### G. Warrantless Seizure of Cellular Phone

38. Defendant Smith seized Dr. Freed's cell phone without a warrant and without consent. The phone was not seized as part of any documented lawful basis. No warrant was obtained at any stage of the proceedings. Dr. Freed did not consent to the seizure. The phone was not returned to Dr. Freed upon his release from jail.

39. Smith's own narrative supplement states: "The Washington County Sheriffs Office had dealt with Mr. Freed at that address the day prior, and also opened and investigation on Mr. Freed on possible charges." The WCSO's own records document that the June 8 response was classified as an Assist Agency matter, not a criminal investigation, that D/S Welch reviewed the evidence presented and found no basis for a criminal investigation, and that no criminal investigation of Dr. Freed was opened. In response to Dr. Freed's public records request, Nicole T. Coil, Washington County Prosecuting Attorney, responded in writing on October 9, 2025, stating: "this office does not maintain any criminal records pertaining to Eric Freed or 739 Campbell Drive. There are no records of accusations against Eric Reed [sic] by anyone. No file has been received from Belpre Police Department regarding Eric Freed or 739 Campbell Drive."

40. The phone was Dr. Freed's primary business device, used for patient communications, appointment management, and coordination with employees of his chiropractic practice. No facts appearing in any record produced connected the phone to any criminal activity. No charges resulted from the phone's contents. During the period of his detention, officers asked Dr. Freed on multiple occasions for the access code to his phone. Dr. Freed did not provide it.

41. At the second pretrial hearing in the trespass case, the City Prosecutor stated that he was waiting on a forensic dump of Monika's cellphone — not Dr. Freed's — to justify charges already filed against Dr. Freed. Dr. Freed's phone was not the subject of the forensic analysis sought by the City Prosecutor. The records do not reflect any connection between Dr. Freed's phone and the trespass charge for which he was arrested. No warrant to seize Dr. Freed's phone in connection with any investigation was ever sought or obtained according to the records produced. No warrant to search the contents of Dr. Freed's phone in connection with any investigation was ever sought or obtained according to the records produced. The phone was not returned to Dr. Freed upon his release. Approximately one week after the arrest, the phone was released to Dr. Freed's defense attorney.

### H. Post-Arrest Detention and Release

42. Dr. Freed was transported to and held at the City building for approximately four

hours before being transported to the Washington County Jail for booking. During those approximately four hours at the City building, Dr. Freed was questioned on multiple occasions. Officers made repeated demands for Dr. Freed's phone access code during his detention. On at least one occasion, Officer Smith entered Dr. Freed's holding cell with the phone in hand and stated words to the effect of "you sure I can't get the code?" Dr. Freed refused each request. No records of those questioning sessions or access code demands — no notes, no recordings, no documentation of any kind — were produced in response to Dr. Freed's public records requests or during the criminal proceedings. After booking, Dr. Freed was released after 9:30 p.m. with no phone, no transportation, no food, and no water. He had not eaten since the day before. He had patients scheduled the following morning. Upon release, jail staff contacted Belpre dispatch at least twice regarding Dr. Freed's lack of transportation. During at least one of those calls, Belpre dispatch stated that if Dr. Freed provided his phone access code, they would access his phone to retrieve phone numbers for him to call. Dr. Freed did not provide the access code. No records of these dispatch calls have been produced in response to Dr. Freed's public records requests.

43. Dr. Freed walked approximately two miles to reach a commercial establishment. There, Dr. Freed contacted City dispatch and informed a City employee that he had no means of returning home. The City dispatch employee responded: "if you didn't want to be in this situation then you shouldn't have gotten arrested." The City provided no transportation assistance. With no phone and no means of summoning help, Dr. Freed was then compelled to walk through the night toward his vehicle. After walking approximately fourteen miles over approximately four hours, a Washington County Sheriff's deputy encountered Dr. Freed and offered assistance. Before transporting Dr. Freed, the deputy contacted Belpre dispatch to confirm whether it was permissible to give Dr. Freed a ride to his vehicle. Belpre dispatch authorized the transport on the condition that Dr. Freed not enter his home at 739 Campbell Drive. The deputy transported Dr. Freed to his vehicle and remained on scene to observe Dr. Freed depart.

**I. Unlawful Exclusion from Home**

44. Dr. Freed was released from the Washington County Jail on his own recognizance. Upon release, jail staff advised him that if he was re-arrested for going back to the house he would not be released. No judge had set any condition barring Dr. Freed from his own home. No eviction proceeding, no landlord-tenant hearing, and no court order had been obtained establishing any right to exclusive possession by the occupants. Nonetheless, when a Washington County Sheriff's deputy later offered Dr. Freed transportation assistance, Belpre dispatch authorized the transport on the condition that Dr. Freed not enter his home at 739 Campbell Drive — an extrajudicial restriction on his right to occupy his own property imposed by Belpre dispatch with no court order and no legal authority.

45. The City Prosecutor contacted Dr. Freed's criminal defense attorney on multiple occasions during the pendency of the prosecution and used his prosecutorial position and the existence of the pending case to keep Dr. Freed excluded from his own home without any judicial authorization. Defense counsel advised Dr. Freed to stay away from 739 Campbell Drive as a result.

46. As a result of this unlawful exclusion, Dr. Freed was excluded from his own Property for a period exceeding thirty days. During this period, Dr. Freed could not access his home, personal property, business records, legally owned firearms, safe, money, or mail. The occupants had unsupervised physical access to Dr. Freed's legally owned firearms inside the Property during this period. Dr. Freed's mail was intercepted and concealed by the occupants during this period.

**J. The Criminal Case, Suppression, and Dismissal**

47. On June 9, 2025, Defendant Smith swore out a criminal complaint charging Dr. Freed with Criminal Trespass, ORC § 2911.21(A)(1), Case No. 25CRB510, Marietta Municipal Court. The complaint described 739 Campbell Drive as "the land or premises of Monika." The criminal complaint simultaneously identified Dr. Freed as the defendant and identified the scene of his alleged trespass as his own home address.

48. The attorney-drafted notice to vacate — which was referenced in Patrolman Smith's narrative supplement, Sergeant Fields's narrative supplement, and Sergeant Fields's incident report — was not produced to Dr. Freed's defense counsel in discovery during the criminal proceedings, despite the fact that other records referencing it were produced. It was an attorney-prepared legal document bearing a law firm tracking number.

49. The case proceeded through three pretrials over approximately three months. The charge was dismissed in September 2025.

**K. Municipal Policy, Admissions, and Ratification**

50. Plaintiff submitted a formal Notice of Claim to the City of Belpre on October 23, 2025, titled "Notice of Claim for False Arrest, Forced Entry and Illegal Seizure of Property," directed to both the Chief of Police and the City Law Director. The Notice identified each constitutional violation, described the incident in detail, and requested evidence preservation. This Notice triggered a sequence of written responses from the City Law Director and retained counsel.

51. By letter dated October 31, 2025, City Law Director Thomas P. Webster responded in his capacity as City Law Director. Webster stated that he had reviewed Dr. Freed's letter and the case file and concluded that "no misconduct by Belpre police officers occurred in this incident."

52. By letter dated November 18, 2025, Dr. Freed responded to Webster's October 31 letter, challenging Webster's reliance solely on the internal case file generated by the same department whose conduct was at issue. He again requested confirmation that all evidence had been preserved, including body-worn camera footage, dispatch records, reports, and officer notes.

53. By letter dated November 21, 2025, Webster responded again in his capacity as City Law Director. Webster stated that he had reviewed both the Belpre City criminal file and reports from the Washington County Sheriff's Office concerning the incidents occurring the day before Dr. Freed's arrest, and concluded that "there was nothing unconstitutional or illegal in your arrest." Webster further stated: "Unless you provide new evidence there is no basis for your claims."

54. By letter dated December 11, 2025, Dr. Freed responded to Webster's "new evidence" demand by providing six documentary exhibits establishing his ownership beyond dispute and that the officers knew before the arrest: (1) the Washington County Auditor record (Parcel No. 080026976000, Owner: FREED ERIC, classified owner-occupied, purchase date October 23, 2002); (2) his Ohio Driver's License listing 739 Campbell Drive as his address — the same license officers took possession of at the time of arrest; (3) the City of Belpre water bill in his name; (4) the AEP electric bill in his name; (5) the Enbridge gas bill in his name; and (6) the LibertyGuard Deluxe Homeowner's Insurance Policy — a homeowner's policy requiring active owner occupancy. The letter also referenced the WCSO report and the Washington County Prosecutor's written confirmation that no criminal referral from Belpre PD existed. Webster received this letter and its six ownership exhibits before writing his December 30 letter.

55. By letter dated December 30, 2025, Webster responded a third time in his capacity as City Law Director. Despite having received the documentary evidence provided in Dr. Freed's December 11 letter, Webster stated: "there was no false arrest. There was probable cause to believe that you had committed a crime. Monika claimed to be a tenant, so the legal notice mentioned was a three day notice contemplated to be used by a landlord to start an eviction action in an Ohio Court." Monika never stated she was a tenant, never identified the premises as hers, and never stated that Dr. Freed was her landlord. On the recorded 911 calls she referred to the property only as "the house" or "the residence" — never as "my house." Smith's own narrative characterizes the entry as into "her house" — a characterization unsupported by anything Monika stated. The letter also states: "The City of Belpre has never possessed the Sheriff's Reports." Webster's own November 21 letter had acknowledged he reviewed the Sheriff's Office reports. Smith's signed narrative supplement references WCSO's involvement. Fields' own signed narrative supplement documents that "Deputies from Washington County S.O. had relayed" information to the occupant. All three documents were in the City's own arrest file when Webster wrote the December 30 letter.

56. By letter dated January 8, 2026, Dr. Freed responded directly to Webster's December 30 letter. The letter stated: "The three-day notice referenced is the statutorily required predicate to initiate a civil eviction action in Ohio. It does not extinguish ownership rights, does not confer exclusive possession absent a court order, and does not convert a civil possession dispute into probable cause for Criminal Trespass." The letter further stated that "at the time of the arrest, officers were presented with facts establishing that I asserted ownership and lawful privilege to be present, that no court order granted exclusive possession to another party, and that no judicial determination barred my entry" and concluded that treating the service of a three-day notice as probable cause for criminal trespass "reflects a misapplication of both landlord-tenant law and constitutional arrest standards." The letter further stated: "The City's continued reliance on this rationale raises concerns beyond an individual officer's judgment. It suggests a policy, custom, or training deficiency that permits civil property disputes to be escalated into criminal arrests in the absence of judicial process, directly implicating municipal liability." The letter stated that Dr. Freed was providing the City a final opportunity to resolve the matter without litigation and that

absent a good-faith reassessment he was prepared to pursue relief under 42 U.S.C. § 1983 and applicable Ohio law. Dr. Freed gave Webster until January 29, 2026 to respond. Webster did not respond.

57. Dr. Freed submitted multiple public records requests seeking written policies, procedures, training materials, and case-specific records. On February 3, 2026, Dr. Freed requested from the City Clerk all written policies, procedures, general orders, directives, training materials, or guidance in effect on June 9, 2025 concerning: (1) arrest of individuals within their own residence, including arrests of homeowners or lawful occupants; (2) forced or warrantless entry into a residence, including exigent-circumstances guidance; (3) seizure of a civilian's cellular telephone incident to arrest; (4) post-arrest release procedures, including supervisory review and required documentation; and (5) safe release or return of individuals following arrest, including obligations to ensure personal safety. In response, the City produced a set of policies simultaneously marked as "draft" and described as being "in effect." Those policies bore copyright dates of March 2026 and no prior versions were produced establishing that any operative policies existed on June 9, 2025.

58. On March 24, 2026, Dr. Freed submitted a records request to the City Law Director seeking all policies, procedures, and training materials describing the responsibilities of the City Law Director in reviewing criminal charges — including evaluation of probable cause, review of evidence provided by law enforcement, and determination of legal sufficiency for initiating or continuing prosecution — along with all case-specific records reflecting the review or evaluation of probable cause for the charges filed on June 9, 2025, all records identifying the basis for the probable cause determination including any reference to a claim that Dr. Freed had been trespassed the day before, and all inter-agency communications between the prosecutor's office, law director's office, law enforcement, and dispatch relating to the evaluation of probable cause. Dr. Freed submitted a separate request to the City Prosecutor's office seeking the same categories of records with respect to the prosecutor's role. On March 25, 2026, Dr. Freed followed up on the February 3 request, specifically documenting the draft/in-effect contradiction in the produced policies and requesting: any prior versions of those policies in effect before March 2026; training materials on warrant requirements, exigent circumstances, and probable cause determinations; training attendance records documenting officer participation in any relevant training; and any materials addressing the distinction between landlord-tenant disputes and criminal enforcement. The City never clarified the status of the produced policies, never produced prior versions, and never produced training attendance records in response to any of these requests.

59. By letter dated March 30, 2026, Brittany Bowland of Baker Dublikar acknowledged receipt of Dr. Freed's records requests and relayed the City Prosecutor's responses, stating: (1) "We do not have any records to provide in response to this request. We do not have policies, procedures, or guidelines related to his request"; (2) "I provided him copies of the case file on 10/9/25. The probable cause determination was made by an Assistant County Prosecutor as there were additional allegations of possible felony offenses made on the same date"; (3) "We do not have any additional records. The incident the day before his arrest involved the Washington County Sheriff's

Office"; and (4) "We are not aware of any records of inter-agency communications."

60. Dr. Freed sent a request dated March 30, 2026 seeking clarification. That request noted that different explanations had been referenced at various points for the basis of the arrest — including a purported prior trespass warning, issues relating to a notice to vacate, and references to possible felony allegations — and requested clarification as to: (1) what specific facts were relied upon at the time of arrest to establish probable cause for criminal trespass; (2) whether any prior trespass warning was actually issued, and if so by whom and when; (3) the nature of any alleged felony conduct referenced, including when those allegations were made, by whom, and what information supported them; (4) whether any such allegations were documented in reports, CAD entries, or other records; (5) whether any communications with the Sheriff's Office occurred prior to the arrest and whether those could be identified or produced; and (6) whether any communication with the Washington County Prosecutor's Office occurred prior to the arrest and if so how that communication was conducted if no records exist. On March 31, 2026, Brittany Bowland of Baker Dublikar responded: "Please be advised that neither our office, nor the City, is under any obligation to respond to your clarification questions. We are only under an obligation to respond to your public records requests. To the extent that any of the items listed below seek records, we will respond to the same as we are responding to your other requests, within a reasonable time. Additionally, please see attached for correspondence from Attorney Lute in relation to this matter."

61. The correspondence from Attorney Lute attached to Bowland's March 31 response, copied to Law Director Thomas Webster, stated that Lute had reviewed the facts asserted in Dr. Freed's correspondence and spoken with relevant City personnel. Lute stated: "Frankly, in relation to many of your requests, there are no materials that specifically deal with the exact scenario which unfolded when the police responded to the residence in this instance." Lute further stated: "As with most police situations, the policies that apply also involve the application of officer discretion, within a constitutional framework." The letter stated that the City takes a position of no liability, that the Belpre Police are immune from liability absent evidence of willful, wanton, or reckless conduct, and that "[w]ith respect to the application of law in situations where information elicited from individuals is contradictory, the officers are not held to a standard of perfection by the law." The letter further stated that "[t]here is clearly no evidence of bad faith, willful, wanton, or reckless conduct on the part of the officers or the City."

62. By letter dated April 8, 2026, Lute responded to Dr. Freed's pre-suit demand letter, again copied to Law Director Thomas Webster. The letter states that the City "takes a position of no liability" and that "the officers reacted reasonably based upon a totality of the circumstances and the information that they were provided at the time."

63. By letter dated April 21, 2026, Brittany Bowland of Baker Dublikar responded to several outstanding records requests. The letter made the following representations: (1) Regarding training materials on warrantless entry, probable cause determinations, and handling of civil property disputes, Bowland stated that the Chief of Police had advised that "there are no training materials" on the subjects identified and that "officers are trained to refer to pertinent revised code sections when needed, i.e.

pulling up R.C. 5321 as a reference tool for landlord / tenant disputes"; and (2) Regarding the policies previously produced, Bowland stated that the policies "are substantively the same to those which would have been in place at the time of the subject incident" and that prior versions are not available because "the policies of the Department are maintained electronically" and "copies of prior versions which existed at a certain time are not available." The letter was copied to Mel Lute, Andrew Webster as City Prosecutor, Tom Webster as City Law Director, and Chief of Police Michael Stump.

64. The City's liability insurer was not notified of Dr. Freed's claim. Dr. Freed discovered this only by contacting the insurer directly and providing that notification himself.

65. The constitutional violations described herein were not isolated acts, but were carried out pursuant to and later ratified as official policy by the City's final policymaker.

## IV. CLAIMS FOR RELIEF

### COUNT I — Warrantless Home Entry

*Fourth Amendment — 42 U.S.C. § 1983*

Against Defendant Smith

66. Plaintiff incorporates all preceding paragraphs.

67. The Fourth Amendment guarantees the right of persons to be secure in their houses against unreasonable searches and seizures. The home receives the highest constitutional protection against warrantless government intrusion. Kyllo v. United States, 533 U.S. 27, 31 (2001).

68. Defendant Smith forcibly entered Dr. Freed's home without a warrant, without consent, and without any exigent circumstances, in direct violation of the Fourth Amendment as interpreted in Payton v. New York, 445 U.S. 573 (1980). Warrantless entry into a private home is presumptively unreasonable. Id. at 586. No emergency existed, no hot pursuit existed, and there was no risk of destruction of evidence. The second call, which prompted Smith's response, reported only that Dr. Freed was back in the house. Dr. Freed's ownership was not disputed by any party at any point. The dispute concerned the terms of his access — specifically, the occupant's claim that he was required to give 24-hour notice before entering.

69. Smith's warrantless entry was made without any pre-entry visual or auditory basis suggesting an emergency. He could not see into the home before forcing entry and had no particularized, objective basis for believing any person inside was in need of immediate aid. His entry was predicated solely on the occupant's complaint call. That call reported only Plaintiff's presence in his own home, described no emergency, no threat, and no criminal conduct, and on two separate occasions the caller expressly stated she did not know if an officer needed to respond. Smith did not knock or announce his presence before forcing entry. The recorded 911 call documents no knock or doorbell before the dogs began barking within approximately 20 seconds of Smith's arrival. The failure to knock and announce further undermines any claim of exigency, as true exigent circumstances would have been apparent before entry rather

than manufactured or exacerbated by the officer's own conduct. Even if Smith had merely ordered Dr. Freed out of his home rather than physically crossing the threshold, the result was the same: Dr. Freed was compelled to exit his own home through the exercise of governmental authority and was immediately handcuffed upon stepping outside. To the extent Defendants argue that the 911 call established consent to entry, that argument fails. Even assuming Monika had sufficient authority as a resident to consent to police entry, she never actually gave that consent. The recorded 911 call contains no statement by Monika inviting or authorizing officers to enter the home. She stated only that Dr. Freed was there. Dispatch instructing her to stay on the phone while officers responded does not constitute consent to entry. Consent must be actual and voluntary — it cannot be inferred from a caller's report that someone is present or from a dispatcher's instructions. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

70. The call that prompted Smith's entry was a civil possession dispute — the same dispute that Belpre PD dispatch had documented as civil 48 hours earlier and that Sergeant Nichols had classified as civil on camera the day before. A civil possession dispute cannot supply the exigent circumstances that the Fourth Amendment requires to justify warrantless entry into a home. An officer's response to a call that is civil on its face does not become constitutionally justified by the officer's failure to recognize it as such.

71. Qualified Immunity Does Not Apply to Defendant Smith as to Count I. The right to be free from warrantless entry into one's own home absent consent, a warrant, or true exigent circumstances was clearly established long before June 9, 2025. Payton v. New York, 445 U.S. 573, 586 (1980). No reasonable officer could have believed that an occupant's complaint call — concerning the same civil property dispute that Belpre PD dispatch and Sergeant Nichols had twice classified as civil only 24–48 hours earlier — created exigent circumstances justifying forced entry. There was no observable or audible disturbance, no hot pursuit, no risk of evidence destruction, and no emergency visible from outside the home. See Reed v. Campbell County, No. 22-5751 (6th Cir. Aug. 30, 2023) (denying qualified immunity where officers made warrantless entry in response to a reported disturbance with no actual exigency; clearly established that such entry violates the Fourth Amendment even in circumstances presenting a more colorable claim of exigency than a mere civil dispute).

72. This violation proximately caused Dr. Freed damage. Defendant Smith is liable for all damages caused by this violation.

**COUNT II — False Arrest Without Probable Cause**

*Fourth Amendment — 42 U.S.C. § 1983*

Against Defendants Smith and Fields

73. Plaintiff incorporates all preceding paragraphs.

74. The Fourth Amendment prohibits arrest without probable cause. Probable cause exists only when the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person in believing that the suspect has committed or

is committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). Officers must have probable cause for every element of the charged offense.

75. To the extent Defendants argue that Dr. Freed was merely "detained" rather than arrested at the moment of handcuffing, that argument fails on the facts. The immediate handcuffing behind his back and placement of Dr. Freed in a locked patrol vehicle was so intrusive that a reasonable person in his position would not have felt free to leave and would have understood he was under custodial arrest. See United States v. Richardson, 949 F.2d 851, 857 (6th Cir. 1991) (placement in a police cruiser "crossed the line into an arrest"). Dr. Freed was handcuffed and placed in the locked patrol vehicle without any questions being asked. There was no altercation, no flight risk, no weapon, and no emergency of any kind. Even assuming arguendo that some minimal detention could have been justified, the officers' actions far exceeded the bounds of a lawful Terry stop. See Richardson, 949 F.2d at 857. First, no reasonable suspicion of criminal activity existed at the inception of the encounter. Officers were already in physical possession of the attorney-prepared notice to vacate — documented in the incident report — which identified Dr. Freed as the property owner and expressly stated that the occupants were "occupying without color of title." Dr. Freed immediately informed them that it was his house and that he lived there. This was a civil possession dispute, not a criminal trespass by the titled owner. See State v. Larason, 143 N.E.2d 502, 503 (Ohio C.P. 1956). Defendants' claim that they were investigating burglary under R.C. 2911.12 does not change the analysis; none of the elements of burglary or the related offense of breaking and entering were present or reasonably appeared to exist. Second, the officers conducted no investigation whatsoever — they asked Dr. Freed no questions and made no effort to dispel or confirm any suspicion before restraining him. A Terry stop must be "strictly limited" to the purpose of the initial stop. Richardson, 949 F.2d at 856. Third, there were no officer-safety or exigent circumstances justifying the level of restraint imposed. Under the totality of the circumstances, Dr. Freed was subjected to a custodial arrest from the moment the handcuffs were applied. Id. at 857.

76. Defendants Smith and Fields arrested Dr. Freed for criminal trespass under R.C. 2911.21(A)(1), which requires that the accused knowingly enter or remain on the land or premises of another without privilege. No element of this offense was satisfied. Dr. Freed could not knowingly trespass on his own property — he knew it was his home, he said so to both officers upon arrival, and that fact was confirmed by his driver's license, the notice to vacate, and Fields' own report. As the fee-simple titled owner and primary resident of 739 Campbell Drive for more than twenty-three years, Dr. Freed's privilege to be present was established as a matter of law and could not be negated by the statements or beliefs of non-owners. The guests present were non-paying licensees with no lease, no rental agreement, and no legal entitlement to exclusive possession. This was not unknown to officers — Fields had personally responded to the first call approximately two hours earlier, had run the vehicle plates and confirmed Dr. Freed's ownership, had reviewed the notice to vacate posted on the door, and had documented the civil nature of the dispute in his own narrative. Officers had both the information and the time between calls to verify the nature of the arrangement before making any arrest. Under clearly established Ohio law, such individuals are licensees whose presence is permissive and revocable at will. A lease

confers a possessory estate granting the tenant exclusive possession and the power to exclude others, including the owner; a license confers no estate in the land and grants no right to exclude the fee-simple owner. See Bewigged By Suzzi, Inc. v. Atlantic Dept. Stores, Inc., 1976 Ohio App. LEXIS 5803 (8th Dist. 1976); Mosher v. Cook United, Inc., 62 Ohio St. 2d 316, 319 (1980) (license is a revocable personal privilege without any estate). A licensee has no possessory interest in real property and no legal right to deny the owner access to the premises. Any attempt by such a guest to assert control — whether by verbal assertion, reliance on a civil notice, or by installing a lock to prevent the owner's entry — is legally ineffective and cannot divest the owner of his superior right to access his own home. The absence of the essential "without privilege" element was apparent from the facts available to the officers at the time of the arrest. The second element — that the premises be those "of another" — was equally unsupported. At the time of arrest, no facts known to officers established that anyone other than Dr. Freed had a superior claim to the property. The sole complainant never claimed the premises were hers — she said only that she lived there. Living in a property does not satisfy that element as against the titled owner. Monika never claimed to be a tenant, never identified Dr. Freed as her landlord, and never asserted any possessory right superior to his.

77. Qualified immunity does not apply. The right to be free from arrest without probable cause — particularly the right of a titled homeowner to be present in his own long-term primary residence without being arrested for criminal trespass — was clearly established. No reasonable officer could have believed probable cause existed when Defendants possessed or had immediate access to overwhelming exculpatory evidence of Dr. Freed's ownership and privilege, including: (1) Dr. Freed's Ohio driver's license listing 739 Campbell Drive as his address, which officers took possession of during the encounter; (2) the attorney-prepared three-day Notice to Vacate (Document No. 4924-5018-5548, v.1) retained by officers and documented in the incident report, which expressly identified Dr. Freed as the owner and the occupants as "occupying without color of title"; (3) Sergeant Fields' own incident report identifying Dr. Freed as the "homeowner" upon arrival; and (4) the Belpre PD dispatch records from June 7, 2025 classifying the matter as civil, and the June 8 WCSO body-camera footage documenting that Belpre Sergeant Nichols and Washington County Deputy Welch both advised that the matter was civil and that the required first step was a three-day notice to vacate — the exact step Dr. Freed then took; and (5) Dr. Freed's own statement at the scene asserting his ownership and privilege to be present, recorded in both officers' own reports, and his offer to have officers call his attorney to verify his right to be there.

78. Officers may not establish probable cause by deliberately ignoring readily available exculpatory information. Ahlers v. Schebil, 188 F.3d 365, 372 (6th Cir. 1999). Smith immediately declared "you don't live here" and focused on the service of the notice to vacate, misapplying R.C. § 5321.05 — a civil statute with no criminal penalty that applies only where a valid landlord-tenant relationship exists under a written rental agreement. No such relationship existed here. The notice to vacate was served because it is the required civil process under Ohio Rev. Code §§ 1923.02 and 1923.04 for a property owner to initiate removal of any occupant — whether tenant or guest — and because Belpre PD and WCSO had advised Dr. Freed the day before that it

was the required first step. Serving a notice to vacate does not create a landlord-tenant relationship where none exists. It is the legal remedy available to an owner regardless of the nature of the occupancy, and its service cannot be used as the basis for a criminal trespass charge against the owner who served it. Even if R.C. § 5321.05 applied, its violation would constitute only a civil matter and could not supply probable cause for a criminal charge. Even assuming arguendo that a lease existed, the occupants still had no legal authority to install a chain lock that barred the titled owner from lawful entry, and the mere absence of 24-hour notice does not create criminal trespass liability for a landlord or owner. Fields documented his refusal to call Dr. Freed's attorney for verification. As documented in Fields' own signed narrative supplement and the City's arrest record, both Belpre PD and the Washington County Sheriff's Office had directed the occupants to pursue civil remedies the day before — directly contradicting the dispatch entry officers received. No prior trespass order or trespass warning against Dr. Freed was ever given. The dispatch characterization that Dr. Freed had been trespassed originated from the first call — hours before Smith responded to the second call — and was contradicted by the recorded 911 call from which it purportedly derived. Fields possessed documented knowledge from the first call that Monika had stated her intention to install a chain guard on the door to prevent Dr. Freed from entering freely. Smith encountered an installed chain lock upon forcing entry — before he had spoken to Monika — and his own narrative identifies it as Monika's lock. Dr. Freed informed Smith upon entry that whoever had installed the lock had no right to put it there. Any reasonable officer would have understood that the occupants lacked any legal authority to install a lock barring the fee-simple owner from his own home. Officers had the legal situation completely inverted — the wrongful act was the installation of the chain lock by the occupants to exclude the titled owner, not its removal by the owner from his own door. The removal of an unauthorized lock from one's own front door is not criminal conduct; rather, the installation of such a lock by informal occupants creates civil liability for them. Officers arrested the victim of the unlawful act while taking no action regarding the act itself. No police report documents any inquiry into the terms of the arrangement under which the occupants were staying at the property. Dr. Freed told both officers directly that there was no lease, that the occupants were guests, and that he had the right to come and go freely. Critically, the sole complainant's own statements never established the essential "without privilege" element of criminal trespass. Monika's recorded 911 call and written statement complained only that Dr. Freed had not given 24-hour notice; she never claimed he had no right to be present, that the premises were hers, or that she had ever communicated any 24-hour notice requirement to him. Officers never asked her whether she had done so. Notably, Monika never described the property as her house — referring to it only as "the house" or "the residence" throughout both recorded calls — and never claimed to be a tenant or identified Dr. Freed as her landlord. No police report documents Monika making any such claim to officers at the scene. Webster's post-incident characterization that "Monika claimed to be a tenant" is contradicted by the recorded calls, by Monika's own written statement, and by the absence of any such statement in either officer's narrative supplement. On the recorded call she stated "I hate to do this" and "I'm just doing what I was told by the

officer," and further stated that officers were "trying to build a case" against Dr. Freed — language reflecting a pre-existing investigative objective rather than a good-faith report of criminal activity. The fact that the articulated basis for the arrest changed across multiple official documents — from the notice to vacate, to a possible burglary, to the 24-hour notice theory, to felony allegations never charged — is itself evidence that no genuine probable cause existed at the moment of arrest. Even under the doctrine of arguable probable cause, no reasonable officer could conclude that a titled homeowner lacked privilege to enter his own property and remove an unauthorized lock under these circumstances — particularly where the only statute supporting their theory carries only civil remedies and creates no criminal liability whatsoever. Probable cause must exist at the moment of arrest, not be assembled afterward while the suspect is already handcuffed. Beck v. Ohio, 379 U.S. 89, 91 (1964). Even accepting the complainant's statements as entirely true, those statements established only that Plaintiff failed to provide "24-hour notice" before entering his own home — a theory that no reasonable officer could have believed satisfied the "without privilege" element of criminal trespass under R.C. § 2911.21 as applied to a fee-simple titled owner.

79. This violation proximately caused Dr. Freed damage. Defendants are liable for all damages caused by this violation.

**COUNT III — Unreasonable Seizure of Cellular Phone**

*Fourth Amendment — 42 U.S.C. § 1983*

Against Defendants Smith and Fields

80. Plaintiff incorporates all preceding paragraphs.

81. The Fourth Amendment protects against unreasonable seizures of personal property. Dr. Freed's cell phone had no connection whatsoever to the criminal trespass charge for which he was arrested — it was not evidence of trespass, not contraband, and not the instrumentality of any offense. Belpre police seized the phone upon arrest expressly for the purpose of a supposed separate investigation by the Washington County Sheriff's Office, not for any purpose related to the trespass arrest itself. That justification was invalid. The search-incident-to-arrest doctrine permits only limited interference with an arrestee's personal effects, justified solely by officer safety and the need to preserve evidence related to the offense of arrest. See Chimel v. California, 395 U.S. 752 (1969); Arizona v. Gant, 556 U.S. 332, 343 (2009) (incident-to-arrest authority is tied to those narrow justifications and does not authorize use of an arrest as a general license to seize property for unrelated investigations). Here, there was no probable cause or even reasonable belief that the phone contained evidence of any crime. Officers could not lawfully confiscate a highly private device like a modern cell phone solely as a tool for a fishing expedition into a separate matter handled by a different agency. Compounding the violation, no such WCSO investigation ever existed. As confirmed by WCSO Case No. 25-007686, the Sheriff's Office found no evidence of any crime, opened no investigation of Dr. Freed, and made no referral. The officers' reliance on this nonexistent investigation rendered the seizure pretextual. Even if the initial physical taking were arguably permissible incident to the custodial arrest, the continued retention of the

phone violated the Fourth Amendment. Once it became clear the phone bore no relation to the trespass charge and no separate legitimate investigation existed, officers were required either to promptly seek a search warrant supported by probable cause or to return the phone — yet they retained it without judicial authorization. Moreover, the Belpre police report states that the phone was retrieved by the WCSO the next day — a characterization contradicted by the Washington County Sheriff's Office, which confirmed through Dr. Freed's attorney that it did not have the phone. No valid basis for the seizure and retention has been established in any record produced. Dr. Freed did not consent to the seizure. While in custodial detention, Belpre officers made repeated demands for his access code. On at least one occasion, Officer Smith entered Dr. Freed's holding cell with the phone in hand and stated words to the effect of "you sure I can't get the code?" Dr. Freed refused. These repeated demands constituted the functional equivalent of an attempt to search the phone's digital contents without a warrant. Under Riley v. California, 573 U.S. 373 (2014), officers may not search the contents of a cell phone seized incident to arrest without a warrant absent true exigent circumstances, which were absent here. Dr. Freed's repeated refusals established that no consent was ever given.

82. The City Prosecutor stated at the second pretrial that he was waiting on a forensic dump of the occupant's cellphone — not Dr. Freed's — further confirming that Dr. Freed's phone served no documented evidentiary purpose in the trespass case. No warrant to seize or search Dr. Freed's phone in connection with any investigation was ever sought or obtained according to the records produced. The unlawful seizure extended beyond the arrest scene. Following Dr. Freed's release from the Washington County Jail, jail staff contacted Belpre dispatch at least twice regarding Dr. Freed's lack of transportation. During at least one of those calls, Belpre dispatch conditioned assistance on Dr. Freed providing his phone access code, stating they would access the phone to retrieve contact numbers for him. This post-release conditioning of assistance on access to phone contents — without a warrant, without consent, and after Dr. Freed's release — constitutes an independent continuation of the unlawful seizure and an additional warrantless attempt to access the phone's contents. No records of these dispatch calls have been produced in response to Dr. Freed's public records requests.

83. Defendant Fields is liable for the phone seizure as a supervisory officer who was present and acquiesced in the unconstitutional seizure. A supervisor who is aware of a constitutional violation and fails to take corrective action is liable under § 1983. Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999). Fields arrived on scene while Dr. Freed was already in custody, was present during the detention period in which the phone was seized and access codes were repeatedly demanded, and took no steps to return the phone or intervene in the seizure. His acquiescence in the unconstitutional seizure renders him independently liable under Count III.

84. Qualified Immunity Does Not Apply. The right to be free from warrantless seizure of personal property was clearly established long before June 9, 2025. No warrant was obtained. No consent was given. No exigent circumstances existed. Even if the phone could be seized incident to the arrest, Riley v. California, 573 U.S. 373 (2014) clearly establishes that officers must obtain a warrant before searching its contents. No

warrant was sought or obtained. Officers repeatedly demanded the access code to search the phone's contents without a warrant. No reasonable officer could have believed that accessing a citizen's phone contents without a warrant under these circumstances was constitutional.

85. This violation proximately caused Dr. Freed damage, including disruption of his chiropractic practice and the inability to summon assistance after release. Defendants are liable for all damages caused by this violation.

**COUNT IV — Malicious Prosecution**

*Fourth and Fourteenth Amendments — 42 U.S.C. § 1983*

Against Defendants Smith and Fields

86. Plaintiff incorporates all preceding paragraphs.

87. A § 1983 malicious prosecution claim requires: (1) initiation of criminal proceedings; (2) lack of probable cause; (3) the proceedings were motivated by malice; (4) termination in plaintiff's favor; and (5) deprivation of liberty. Sykes v. Anderson, 625 F.3d 294, 308–09 (6th Cir. 2010); Thompson v. Clark, 596 U.S. 36 (2022). The suppression of material exculpatory evidence during a prosecution initiated without probable cause is further evidence of malice. Brady v. Maryland, 373 U.S. 83 (1963).

88. All elements are satisfied: (a) criminal proceedings were commenced against Dr. Freed. Defendant Smith initiated those proceedings by executing and filing a sworn criminal complaint alleging that Dr. Freed entered "the premises of Monika Parkinson" without privilege. (Exhibit A) The criminal complaint was based on a materially false and misleading characterization of the Property as belonging to a third party and of Dr. Freed as lacking privilege; (b) no probable cause existed at the moment of the physical arrest — no charge had been determined, no witness had been interviewed, and no prosecutorial direction had been sought. Dr. Freed was arrested first; the legal justification was assembled afterward. According to Smith's narrative, the charge was based on Monika's post-arrest statement and an Assistant Prosecutor's direction given after Dr. Freed was already in custody — what Smith told the prosecutor and what the prosecutor actually said is a matter for discovery. Sergeant Fields's own report identified Dr. Freed as the homeowner upon arrival. The criminal complaint listed Dr. Freed's own home address as both his address and the scene of the alleged trespass — charging him with trespassing at his own address.

89. No reasonable officer could conclude that a titled property owner lacked privilege to enter his own property under the circumstances known to Defendants. Criminal trespass under ORC § 2911.21 requires presence on the premises "of another." Neither occupant ever established 739 Campbell Drive as their legal address of record, and no documentation in the record establishes that either occupant claimed 739 Campbell Drive as their legal address. The City Prosecutor stated at the second pretrial that he was still seeking evidence to justify charges already filed. The articulated basis for the arrest and prosecution changed across multiple official documents — from the notice to vacate served, to a possible burglary discussed while Dr. Freed was in custody, to the 24-hour notice theory drawn from a post-arrest witness statement, to felony allegations that were never charged. The fact that no

consistent probable cause theory existed across these documents is itself evidence that no genuine probable cause existed at the moment of arrest; (c) the prosecution was used as a tool to enforce Dr. Freed's unlawful exclusion from his own home rather than any legitimate prosecutorial objective. The charge was initiated without a determined probable cause basis and maintained for three months. During that period, Smith had been in documented communication with WCSO during Dr. Freed's detention — before the charge was formally filed — and Fields had left a voicemail for WCSO from the first call scene. The prosecution continued through three pretrials while information confirming the civil classification of the WCSO response was readily ascertainable by any follow-up with the Sheriff's Office. Multiple items of records were not produced in discovery or in response to initial public records requests — including the attorney-drafted notice to vacate referenced in multiple police reports, which was not produced during the criminal proceedings and was not produced in response to Dr. Freed's initial public records request, but was ultimately produced on April 16, 2026 only after Dr. Freed submitted a second specific request for it; a Belpre PD dispatch record initiated by Dr. Freed on June 8 that was not produced among the call records; and any records of the multiple questioning sessions conducted at the City building during the approximately four hours Dr. Freed was held there before transport to the jail. The belated production of the notice to vacate on April 16, 2026 confirms that the document existed and was in the City's possession at the time Law Director Webster reviewed the file and issued his ratification letters — documents in which he characterized the notice to vacate as evidence of a landlord-tenant relationship while simultaneously failing to acknowledge that it expressly identified Dr. Freed as the owner and the occupants as "occupying without color of title." (d) the charge was dismissed in September 2025 in Dr. Freed's favor, see Thompson v. Clark, 596 U.S. 36 (2022); and (e) Dr. Freed suffered ongoing deprivation of liberty, property, and professional livelihood. The very person named in Smith's complaint as the purported owner had presented her evidence to a Sheriff's deputy the day before and been told it showed no crime — a fact not disclosed to Dr. Freed during the prosecution. The City Prosecutor's office later confirmed in writing that the probable cause determination was made by an Assistant County Prosecutor based on "additional allegations of possible felony offenses made on the same date" — felony allegations that were never charged.

90. Additionally, while Dr. Freed was handcuffed in the patrol vehicle, Fields told him that officers were considering charging him with burglary. The basis Fields articulated for that theory is not documented in any official police report. What is documented is Smith's affidavit characterizing Dr. Freed as "ripping down a lock Monika had put up inside the door" — the same act Smith encountered upon entry. Smith's own report identifies the lock as Monika's before he had spoken to her, and Dr. Freed told Smith upon entry that whoever installed the lock had no right to put it there to lock him out of his house. No burglary charge was ever filed.

91. Qualified Immunity Does Not Apply. The right to be free from malicious prosecution without probable cause was clearly established. Sykes v. Anderson, 625 F.3d 294 (6th Cir. 2010); Thompson v. Clark, 596 U.S. 36 (2022). No reasonable officer could have believed probable cause existed for the reasons detailed in Count II above. Under Chiaverini v. City of Napoleon, Ohio, 602 U.S. ___ (2024), the presence of probable

cause for one charge does not categorically defeat a Fourth Amendment malicious prosecution claim relating to another baseless charge. Each charge must be evaluated individually. The burglary threat, made while Dr. Freed was in custody and not reflected in any official police report, constitutes an independent basis for malicious prosecution liability. The withholding of the exculpatory Notice to Vacate during discovery is additional evidence of malice. No reasonable officer could have believed the initiation and continuation of these proceedings was lawful.

92. Defendants are liable for all damages proximately caused by this violation.

**COUNT V — Substantive Due Process**

*Fourteenth Amendment — 42 U.S.C. § 1983 [Pleaded in the Alternative to Fourth Amendment Claims]*

Against All Defendants

93. Plaintiff incorporates all preceding paragraphs.

94. Plaintiff has a fundamental liberty and property interest in occupying and enjoying his own home. The home is among the most protected interests recognized in constitutional law. See Moore v. City of East Cleveland, 431 U.S. 494, 499 (1977). Dr. Freed's fee-simple ownership of 739 Campbell Drive places this interest at the core of the liberty the Fourteenth Amendment protects. To the extent this claim is not subsumed by the Fourth Amendment claims — and to the extent any Fourth Amendment claim fails to provide a complete remedy — this count provides an independent basis for relief. Defendants' conduct deprived Dr. Freed of that interest without any court order, judicial authorization, or legal process, in a manner that shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). The conscience-shocking conduct includes: (1) the warrantless forced entry into Dr. Freed's home without consent, exigency, or probable cause of any crime; (2) the arrest of the titled homeowner in his own home without a single question asked; (3) Belpre dispatch conditioning a Washington County Sheriff's deputy's transport of Dr. Freed on the condition that he not enter his own home — an extrajudicial restriction on Dr. Freed's right to occupy his own property imposed by Belpre dispatch with no court order, no restraining order, and no legal authority; (4) the use of a pending criminal prosecution to enforce that extrajudicial exclusion for over thirty days; and (5) the complete bypass of Ohio's statutory judicial process under ORC Chapter 1923, which requires a hearing before any possessory right in residential property can be disturbed. No restraining order was sought. No eviction proceeding was filed. No court of any kind authorized Dr. Freed's exclusion from his own home. This extrajudicial use of criminal process to effect what amounts to a de facto eviction of the titled homeowner is precisely the type of executive abuse the substantive due process clause was designed to prevent.

**COUNT VI — Procedural Due Process**

*Fourteenth Amendment — 42 U.S.C. § 1983*

Against All Defendants

95. Plaintiff incorporates all preceding paragraphs.

96. Dr. Freed held a protected property interest in the possession and occupancy of 739 Campbell Drive as its fee-simple titled owner. A procedural due process claim requires: (1) a protected liberty or property interest; (2) deprivation of that interest by the government; and (3) inadequate process. See Mathews v. Eldridge, 424 U.S. 319, 335 (1976); Bd. of Regents v. Roth, 408 U.S. 564, 569 (1972). All three elements are satisfied here. First, fee-simple ownership of a primary residence is among the most clearly established protected property interests under the Fourteenth Amendment. Second, Defendants deprived Dr. Freed of that interest by arresting him in his own home, excluding him from it for over thirty days, and using the pendency of a criminal prosecution to enforce that exclusion. Third, the process afforded was constitutionally inadequate — indeed, no process was afforded at all. Ohio law provides specific judicial procedures that must be followed before possessory rights in residential property can be disturbed: under ORC Chapter 1923, any party seeking to alter those rights must obtain a judicial hearing, with notice to all parties and an opportunity to be heard before a court of competent jurisdiction. Defendants bypassed these procedures entirely. No court order was sought. No hearing was held. No notice of any proceeding was provided to Dr. Freed. No opportunity to be heard before any tribunal was offered. Applying the Mathews balancing test, the private interest at stake — a fee-simple owner's right to occupy his own home — is substantial; the risk of erroneous deprivation through the procedures used — arrest by police officers responding to a civil dispute without judicial authorization — is high, as this case demonstrates; and the governmental interest in bypassing judicial process entirely is minimal where Ohio provides a straightforward civil remedy. The balance compels the conclusion that due process required at minimum a judicial hearing before Dr. Freed could be excluded from his own home. None was provided. Defendants are liable for all damages proximately caused by this violation.

**COUNT VII — Municipal Liability (Monell)**

*42 U.S.C. § 1983*

Against Defendant City of Belpre

97. Plaintiff incorporates all preceding paragraphs.

98. The constitutional violations described herein were not isolated acts of rogue officers, but were carried out pursuant to, and later expressly ratified as, official City policy. Defendant City of Belpre is therefore liable under Monell v. Dep't of Social Services, 436 U.S. 658 (1978), and its progeny. A municipality is liable under § 1983 when an unconstitutional act is caused by an official policy or custom, or by a single decision of a final policymaker that adopts both the conduct and the unconstitutional basis for it. Pembaur v. City of Cincinnati, 475 U.S. 469, 480–83 (1986); Jackson v. City of Cleveland, 925 F.3d 793, 800–01 (6th Cir. 2019).

a. Ratification by Final Policymaker. The City of Belpre is liable under the ratification theory of Monell. Its final policymaker with respect to legal positions on police misconduct — City Law Director Thomas P. Webster — possessed final, unreviewable decision-making authority under Ohio Rev. Code § 733.51. After receiving Plaintiff's formal Notice of Claim and, later,

six documentary exhibits conclusively establishing ownership and continuous residency, Law Director Webster reviewed the Belpre PD file, the Washington County Sheriff's Office reports, and the attorney-prepared Notice to Vacate. He then issued three separate written ratifications in his capacity as City Law Director expressly approving the officers' conduct and the precise unconstitutional legal theory underlying it: "there was no false arrest. There was probable cause to believe that you had committed a crime. Monika claimed to be a tenant, so the legal notice mentioned was a three day notice contemplated to be used by a landlord..." These were not settlement overtures or tentative positions; they were affirmative, post-notice-of-claim declarations that the warrantless entry, arrest of the titled homeowner, and disregard of exculpatory evidence were lawful and consistent with City policy. This deliberate ratification by the City's final policymaker — made with full knowledge of the facts — adopted the officers' actions as official policy and is sufficient to impose Monell liability. See Pembaur, 475 U.S. at 480–83. This policy, custom, or practice existed at the time of Plaintiff's arrest and was the moving force behind the constitutional violations described herein.

Webster's deliberate non-response to Dr. Freed's January 8, 2026 letter — which specifically challenged the City's probable cause theory on legal grounds and gave Webster until January 29, 2026 to respond — constitutes a fourth ratification by silence. The ratification was reaffirmed on two subsequent occasions by retained counsel acting with the Law Director's knowledge and copied to him: on March 31, 2026, Lute stated "there is clearly no evidence of bad faith, willful, wanton, or reckless conduct on the part of the officers or the City"; and on April 8, 2026, Lute reiterated that "the officers reacted reasonably based upon a totality of the circumstances." These post-incident statements constitute additional and independent ratifications of the unconstitutional conduct as consistent with City policy. See Jackson v. City of Cleveland, 925 F.3d 793, 800–01 (6th Cir. 2019). Further, to Plaintiff's knowledge, neither Officer Smith nor Sergeant Fields has been suspended, disciplined, or subjected to any internal review as a result of the events of June 9, 2025. The failure of the City's final policymakers to impose any discipline after receiving Plaintiff's detailed Notice of Claim, six documentary exhibits establishing ownership, and multiple written challenges to the legal basis for the arrest constitutes an additional and independent ratification of the officers' conduct as consistent with City policy. See Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir. 1985) (failure to investigate or discipline officers after learning of constitutional violations is evidence of ratification and deliberate indifference).

b. Failure to Train. The City failed to adequately train its officers regarding: (1) the Fourth Amendment warrant requirement for entry into a private home absent consent or true exigent circumstances; (2) the requirement that probable cause for every element of an offense — including the "without privilege" and "premises of another" elements of ORC § 2911.21 — must exist at the moment of arrest; (3) the legal concept of "privilege" as

applied to criminal trespass — specifically that a fee simple owner's privilege to enter and remain on his own property is established as a matter of law and cannot be negated by the presence of non-paying guests with no lease or legal right to possession; (4) the distinction between civil property disputes and criminal conduct, including the status of informal guests as licensees whose presence is permissive and revocable and who have no authority to exclude the property owner; (5) officers' obligation not to deliberately ignore readily available exculpatory evidence, such as a property owner's driver's license, an attorney-prepared notice to vacate stating "occupying without color of title," or a colleague's prior on-scene determination that the matter is civil; (6) the constitutional requirements for seizure of personal property incident to arrest, including that such seizure must be tied to the offense of arrest and not used as a general investigative tool for unrelated matters, see Chimel v. California, 395 U.S. 752 (1969); Arizona v. Gant, 556 U.S. 332 (2009), and that the contents of a seized cell phone may not be searched without a warrant, see Riley v. California, 573 U.S. 373 (2014); and (7) the proper response to a civil possession dispute governed by ORC Chapter 1923, including the statutory procedure under ORC § 1923.04 that a titled property owner must follow to direct informal guests to vacate — the precise procedure Dr. Freed was following at the time of his arrest. The absence of such training is established by multiple independent written admissions. The City's retained counsel admitted in writing: "Frankly, in relation to many of your requests, there are no materials that specifically deal with the exact scenario which unfolded" and that "the policies that apply also involve the application of officer discretion, within a constitutional framework" — a direct admission that officers were left to exercise unfettered discretion with no specific policy guidance. Subsequently, as documented in paragraph 62 above, on April 21, 2026, the Chief of Police confirmed through retained counsel that "there are no training materials" on warrantless entry, probable cause determinations, or handling of civil property disputes, and that officers are instead "trained to refer to pertinent revised code sections when needed, i.e. pulling up R.C. 5321 as a reference tool for landlord / tenant disputes" — a direct, on-the-record admission by the City's own Chief of Police of the precise training gap alleged here. R.C. 5321 is the Ohio landlord-tenant statute — a civil statute that applies only where a valid rental agreement exists and that carries no criminal penalty. Directing officers to apply R.C. 5321 as the analytical framework for property disputes — without training on the privilege element of criminal trespass or the constitutional requirements for warrantless entry — is itself the training deficiency that produced the constitutional violations alleged here. The City produced policies dated March 2026 — nine months after the arrest — as purportedly operative at the time of the incident. When questioned, the City explained that its policies are maintained and updated electronically and that prior versions are therefore unavailable. Notably, the documents produced are marked as draft versions, and no explanation has been provided reconciling that designation with the City's representation that these are the operative policies. No prior versions in effect on June 9, 2025

have been produced. No training attendance records were produced in response to any of Dr. Freed's requests. The City Prosecutor's office independently confirmed in writing that it had no policies, procedures, or guidelines governing the review of criminal charges, probable cause evaluation, or legal sufficiency determination. Officers not only lacked training on ORC § 1923.04 — they treated statutory compliance with it as criminal conduct. The failure to train was so fundamental that officers not only arrested the titled owner for criminal trespass in his own home but actively considered felony charges against him for the same conduct. The City Prosecutor's office confirmed that the probable cause determination was based on additional felony allegations made the same date as the arrest. That officers reached as far as felony-level criminal exposure for a titled homeowner present in his own property is the most direct possible demonstration that the absence of training on the civil/criminal distinction was the moving force behind the constitutional violations here. The need for such training is obvious given the core constitutional rights at stake. The City knew or should have known that, absent training on these issues, officers would confront situations in which a property owner's lawful presence could be misinterpreted as criminal trespass, particularly where occupants assert informal or conflicting claims of residence. City of Canton v. Harris, 489 U.S. 378, 390 (1989). The Sixth Circuit has confirmed that these rights were clearly established, including that warrantless entry into a home in response to a reported disturbance violates the Fourth Amendment absent actual exigency. Reed v. Campbell County, No. 22-5751 (6th Cir. Aug. 30, 2023). This policy, custom, or practice existed at the time of Plaintiff's arrest and was the moving force behind the constitutional violations described herein.

c. Deliberate Indifference. The City's deliberate indifference is evidenced by: the June 7 dispatch classifying the matter as civil; Sgt. Nichols' on-camera advice that the dispute was civil and that Plaintiff should use the three-day notice — the exact step Plaintiff then took; the June 9 arrest for doing precisely what Sgt. Nichols had instructed; the post-incident ratification by the Law Director and retained counsel; and the City dispatch employee's response to Plaintiff after his release — "if you didn't want to be in this situation then you shouldn't have gotten arrested" — when he sought transportation assistance after walking two miles from the jail without a phone, food, or water. The deliberate indifference is further demonstrated by the magnitude of the constitutional risk created by the training gap. Officers responding to a civil property dispute without training on the civil/criminal distinction or the privilege element of criminal trespass were in a position to — and did — expose a licensed healthcare professional to felony charges arising from his presence in his own home, as documented in subitem (b) above. A felony charge alone — regardless of outcome — would have triggered mandatory reporting obligations to the Ohio State Chiropractic Board, potential emergency suspension of Dr. Freed's license, loss of professional liability insurance, and devastating reputational harm in the small community where his practice operates. In a healthcare profession governed

by strict licensing requirements, the public filing of felony charges carries immediate and potentially irreversible professional consequences independent of any conviction. The charge alone could have bankrupted Dr. Freed, ended his chiropractic practice, destroyed his commercial real estate ventures, terminated his business relationships, and cost him his home and personal assets. The obviousness of this risk — that misclassifying a civil property dispute as criminal conduct could expose a professional to career-ending consequences — underscores the need for adequate training and establishes deliberate indifference to the constitutional rights of persons in Dr. Freed's position. This policy, custom, or practice existed at the time of Plaintiff's arrest and was the moving force behind the constitutional violations described herein.

99. Each of the foregoing failures was a moving force behind the violations of Dr. Freed's constitutional rights. The City maintained no training or policy governing the constitutional limits of arrest in civil property disputes, and affirmatively ratified the arrest despite objective evidence negating probable cause. The failure to train officers on the legal concept of privilege, the distinction between civil possession disputes and criminal conduct, and the rights of property owners vis-à-vis informal guests — coupled with the ratification of unconstitutional conduct by the City's final policymaker — reflects deliberate indifference to the constitutional rights of individuals and was the moving force behind the violations of Plaintiff's Fourth Amendment rights. The constitutional violation suffered by Dr. Freed was the foreseeable consequence of that training gap: when officers are not trained to distinguish civil possession disputes from criminal trespass, and are not trained on the privilege element of ORC § 2911.21 as applied to property owners, the arrest of a titled owner in a civil possession dispute is the predictable result. This is not speculation — the Chief of Police has confirmed on the record, that officers receive no training on these subjects and are instead directed to apply R.C. 5321 as their reference tool for property disputes. That admission establishes both the existence of the training gap and its direct causal connection to the violations that occurred here. Had officers been properly trained on the civil/criminal distinction, on the privilege element of ORC § 2911.21, and on the constitutional requirements for warrantless entry, this arrest would not have occurred. A trained officer would have recognized that a titled homeowner present in his own property with a driver's license listing that address, an attorney-prepared notice identifying him as owner, and a colleague's prior civil determination had privilege to be present as a matter of law. The confusion that produced the arrest was not a reasonable mistake of judgment — it was the direct and foreseeable product of the City's failure to train. Where the absence of probable cause flows wholly from a training deficiency on the very legal concepts that define the charged offense, no arguable probable cause can exist and the municipality cannot shield itself behind officer discretion. The City of Belpre is not entitled to qualified immunity, as that defense is unavailable to municipalities as a matter of law. Owen v. City of Independence, 445 U.S. 622 (1980). The City is liable for all damages proximately caused thereby.

**COUNT VIII — Civil Conspiracy**

*42 U.S.C. § 1983*

Against Defendants Smith and Fields

100. Plaintiff incorporates all preceding paragraphs.

101. Defendants Smith and Fields acted in concert pursuant to an agreement or understanding to deprive Dr. Freed of his constitutional rights. Smith and Fields responded together to both calls on June 9, 2025, jointly made the arrest decision, and coordinated their official reports to omit the same exculpatory facts — including Dr. Freed's ownership assertions, his offer of attorney verification, and the pre-Miranda burglary exchange — while each misrepresented the sequence of events in a manner that concealed that the arrest preceded any witness interview. During the approximately two hours between the first and second calls, Fields had documented information establishing that the dispute was civil, that Dr. Freed was the titled owner, that the notice to vacate was legally required, and that the occupants had announced their intention to install a chain lock to exclude the owner. The recorded June 9 first call further documents Monika stating that officers had told her to call back because they were trying to "build a case" on Dr. Freed — suggesting pre-arrest coordination between officers and the occupants directed toward effecting an arrest of the titled owner. Smith's own report identifies the lock as Monika's before he had spoken to her — establishing that Smith had pre-entry knowledge of the lock's origin, whether from Fields or from the first call record. Fields' refusal to call Dr. Freed's attorney, documented in his own report, and Smith's simultaneous refusal to verify ownership reflect coordinated action toward the common objective of effecting an arrest both officers understood to lack probable cause. This conspiracy directly caused the injuries described herein.

**COUNT IX — False Arrest and False Imprisonment**

*Ohio Common Law*

Against Defendants Smith and Fields

102. Plaintiff incorporates all preceding paragraphs. Defendants Smith and Fields intentionally confined Dr. Freed without lawful justification. Dr. Freed was the owner and primary resident of 739 Campbell Drive and had every legal right to be present there. As a direct and proximate result, Dr. Freed suffered the damages described herein.

**COUNT X — Conversion**

*Ohio Common Law*

Against Defendant Smith

103. Plaintiff incorporates all preceding paragraphs. Defendant Smith wrongfully exercised dominion over Dr. Freed's cell phone — seized without a warrant and not returned at release — and over Dr. Freed's attorney-prepared Notice to Vacate, which was removed from Dr. Freed's property and withheld from defense counsel during the criminal proceedings despite being referenced in multiple official police reports.

As a direct and proximate result, Dr. Freed suffered the damages described herein.

**COUNT XI — Intentional Infliction of Emotional Distress**

*Ohio Common Law*

Against All Defendants

104. Plaintiff incorporates all preceding paragraphs. Defendants' collective conduct — arresting a physician in his own home without probable cause; threatening to charge him with burglarizing his own property; releasing him after 9:30 p.m. without phone, transportation, food, or water; refusing transportation assistance with the statement "if you didn't want to be in this situation then you shouldn't have gotten arrested"; and maintaining a baseless prosecution through three pretrials while excluding him from his home without any court authorization — constitutes extreme and outrageous conduct that no reasonable person could be expected to endure. Defendants intended or recklessly disregarded the probability of causing severe emotional distress. Dr. Freed has suffered and continues to suffer severe emotional distress as a result. Yeager v. Local Union 20, 6 Ohio St. 3d 369 (1983).

## V. DAMAGES

105. As a direct and proximate result of Defendants' conduct, Dr. Freed has suffered and continues to suffer:

- Loss of liberty and physical freedom during his detention, arrest, and the period of unlawful exclusion from his home;
- Physical suffering, including walking approximately fifteen miles on foot following release after 9:30 p.m. — approximately two miles to reach a commercial establishment and a further thirteen miles home after being refused transportation assistance by City dispatch — without a phone, food, or water, for more than four hours;
- Severe and ongoing emotional distress, mental anguish, humiliation, and anxiety, including from the without-prejudice dismissal leaving the matter unresolved;
- Substantial reputational harm to his professional standing as a licensed chiropractor. His arrest and the associated criminal proceedings became a matter of public record, damaging his professional reputation and patient relationships;
- Reputational and economic harm to his standing as founder, President, and organizer of the Belpre Farmers' Market, whose board members, donors, vendors, and community participants became aware of his arrest through the public record;
- Reputational and economic harm to his standing as a commercial property owner and landlord, whose commercial tenants and business contacts may search his public arrest record;
- Business disruption caused by the warrantless seizure of his primary business phone, severing patient communications, appointment management, and employee coordination;
- Lost patient income during the period of disruption;

- Criminal defense attorney fees of not less than $4,000 incurred in Case No. 25CRB510;
- Utility costs accruing during the period of exclusion;
- Deprivation of access to his legally owned firearms for over thirty days, during which the occupants had unsupervised physical access to those firearms;
- Interception and concealment of his mail during the period of unlawful exclusion;
- Pre-litigation costs; and
- Such other damages as are proven at trial.

106. Plaintiff seeks punitive damages against individual Defendants Patrolman G.W. Smith and Sergeant J.R. Fields for their willful, deliberate, and reckless disregard of Dr. Freed's clearly established constitutional rights.

107. Plaintiff seeks attorney's fees and costs pursuant to 42 U.S.C. § 1988 upon retention of counsel.

## VI. INJUNCTIVE RELIEF

108. Plaintiff seeks prospective injunctive relief requiring Defendant City of Belpre to implement the following reforms, as money damages alone are insufficient to remedy the systemic failures giving rise to these violations:

a. Police Officer Training. All officers shall receive mandatory documented training on: (1) Fourth Amendment warrant and probable cause requirements, including the prohibition on warrantless home entry absent exigent circumstances or consent; (2) the requirement that probable cause exist before arrest, not after; (3) the constitutional requirements governing seizure of personal property incident to arrest, including that such seizure must be tied to the offense of arrest and not used as a general investigative tool for unrelated matters under Arizona v. Gant, 556 U.S. 332 (2009), and that the contents of a seized cell phone may not be searched without a warrant under Riley v. California, 573 U.S. 373 (2014); (4) the distinction between civil property matters and criminal conduct; and (5) the rights of property owners under Ohio law, including the elements required under Ohio Rev. Code § 2911.21 and the civil nature of forcible entry and detainer proceedings under Ohio Rev. Code § 1923.04.

b. City-Wide Written Property Dispute Policy. The City shall adopt a written policy establishing that: (1) all possessory property disputes shall be resolved exclusively through judicial process under Ohio Rev. Code Chapter 1923; (2) police shall not arrest a property owner for trespass in their own home based solely on the presence of a guest or a notice to vacate; and (3) no City official shall direct a property owner to vacate their own property absent a valid court order.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric F. Freed, D.C., proceeding pro se, respectfully requests that

this Court enter judgment in his favor and against Defendants, and award the following relief:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages against individual Defendants Patrolman G.W. Smith and Sergeant J.R. Fields for willful, deliberate, and bad-faith conduct in disregard of Plaintiff's clearly established constitutional rights;

C. A permanent injunction requiring Defendant City of Belpre to implement the training and policy reforms set forth in Section VI above;

D. Attorney's fees and costs pursuant to 42 U.S.C. § 1988 upon Plaintiff's retention of counsel;

E. An independent investigation of the conduct described herein; and

F. Such other and further relief as this Court deems just and proper.

## VIII. JURY DEMAND

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE pursuant to Federal Rule of Civil Procedure 38(b).

## IX. CERTIFICATION PURSUANT TO RULE 11

I, Eric F. Freed, D.C., certify pursuant to Federal Rule of Civil Procedure 11(b) that to the best of my knowledge, information, and belief, formed after reasonable inquiry, this Complaint is not presented for any improper purpose; the legal contentions are warranted by existing law or a nonfrivolous argument for its modification; the factual contentions have evidentiary support or are likely to have such support after reasonable opportunity for discovery; and the denials of factual contentions are warranted on the evidence or reasonably based on belief or lack of information.

Respectfully submitted,

______________________________

Eric F. Freed, D.C., Pro Se Plaintiff

604 Washington Blvd

Belpre, Ohio 45714

304-481-5619

docfreed@hotmail.com

Date: April 29, 2026